IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STATE OF WISCONSIN,

     Plaintiff,

     v.

KALSHI, INC., KALSHIEX LLC, KALSHI KLEAR
INC., KALSHI KLEAR LLC, KALSHI TRADING
LLC, ROBINHOOD MARKETS, INC., ROBINHOOD
DERIVATIVES LLC, COINBASE FINANCIAL
MARKETS, INC., and JOHN DOES 1-20,

     Defendants.

Case No. 26-CV-378

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

JOSHUA L. KAUL
Attorney General of Wisconsin

COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

LEWIS W. BEILIN
Assistant Attorney General
State Bar #1038835

Attorneys for Plaintiff

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636 (Roth)
(608) 266-5218 (Gibson)
(608) 266-3076 (Beilin)
(608) 294-2907 (Fax)
colin.roth@wisdoj.gov
charlie.gibson@wisdoj.gov
lewis.beilin@wisdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................5

STATEMENT OF THE CASE .................................................................6

    I.    Wisconsin bans most sports betting today, as it has done for much of its history. ..................................................................................6

    II.    Kalshi facilitates sports betting through its event contract trading platform...................................................................................9

        A.    Kalshi makes money by operating a prediction market on which event contracts are traded....................................9

        B.    Kalshi facilitates sports betting through the trading of sports-related event contracts on its prediction market. ................................................................................ 10

    III.    Robinhood and Coinbase facilitate sports betting through partnerships with Kalshi................................................................ 16

        A.    Robinhood and Coinbase partner with Kalshi to use Kalshi's prediction market. ................................................ 16

        B.    Robinhood and Coinbase facilitate sports betting through the trading of sports-related event contracts....... 17

    IV.    The State brings this motion for preliminary injunction while preserving its objection to the Court having subject matter jurisdiction over the action. ............................................ 18

LEGAL STANDARD.............................................................................. 18

ARGUMENT .......................................................................................... 19

    I.    The State has made a "strong showing" that Defendants are causing a public nuisance by facilitating illegal sports betting........................................................................................ 19

        A.    Defendants' facilitation of sports betting violates Wis. Stat. § 945.03(1m) and thus is causing a public nuisance.......................................................................... 19

B.    Federal law does not preempt Wisconsin's gambling ban as applied to Defendants' sports betting operations. .......................................................... 22

    1.    Two clear-statement rules favor the State's position. ................................................. 23

    2.    Even if sports-related event contracts are "swaps," the CEA does not preempt Wisconsin's gambling laws. .......................................................... 26

        a.    The CEA's reference to "exclusive jurisdiction" is not an express preemption provision. ........................................................ 27

        b.    The CEA does not preempt the entire field of sports betting regulation. ............................ 28

        c.    Wisconsin's sports betting ban is not conflict preempted by the CEA. ...................... 32

    3.    Sports-related event contracts are not swaps, anyway.................................................. 35

II.    Defendants' criminal sports betting operations are causing irreparable harm to Wisconsinites. .............................................. 39

A.    Defendants' public nuisances can be enjoined without a separate showing of irreparable harm............................ 40

B.    Defendants' open, repeated, ongoing criminal violations are causing irreparable harm. .......................... 41

C.    Defendants' sports betting operations cause irreparable public health harms. ....................................... 43

III.    The balance of equities and public interest strongly favor a preliminary injunction.............................................................. 45

CONCLUSION......................................................................... 47

## INTRODUCTION

Sports betting has long been illegal in Wisconsin, with exceptions only for certain Native American tribal gaming operations. Yet three companies—Kalshi, Robinhood, and Coinbase—are working together to facilitate illegal sports betting throughout the State. That public nuisance should be enjoined as this litigation proceeds.

Through their so-called "prediction markets," Kalshi, Robinhood, and Coinbase profit when Wisconsin residents place bets on the outcome of sporting events, just like how ordinary casino sportsbooks profit from the bets people make there. For instance, Wisconsinites could use these companies' services to place all kinds of bets on the recent NCAA college basketball tournament, including who would win the Final Four matchup between the University of Michigan and the University of Arizona, which team would cover the point spread, and even which team would first score ten points. And for every bet made, these companies collect a fee akin to a casino's rake at a poker table.

Kalshi, Robinhood, and Coinbase use a fig leaf to disguise the casino-style sports betting they facilitate in Wisconsin. They relabel their sports bets as "event contracts," meaning contracts traded between buyers and sellers at agreed-upon prices. To return to the NCAA basketball tournament, as of April 3, 2026, traders could buy contracts taking the position that the University of Michigan would win its Final Four matchup with the University of Arizona for

around $0.53, which reflected a roughly 53% projected chance of Michigan winning. When Michigan won, event contract holders who bet on that team winning received $1 per contract and those who instead bet on Arizona winning received nothing. That is indistinguishable from an ordinary, illegal sports bet, as defined by Wis. Stat. § 945.01(1). Parties to these "event contracts" wager money on whether a given sports-related outcome will occur, just as when people bet on that same outcome using traditional casino-style sportsbooks.

By making money off illegal sports betting, these companies are each engaging in criminal gambling activity under Wis. Stat. § 945.03(1m). Those ongoing, repeated criminal violations represent a public nuisance that should be abated immediately through a temporary injunction. Two other state courts have recently enjoined this kind of sports betting, and this Court should join them.[1] (Kennedy Decl. Ex. 1–2.)

## STATEMENT OF THE CASE

**I.    Wisconsin bans most sports betting today, as it has done for much of its history.**

The Wisconsin Legislature specifically banned sports betting as early as 1898. People could not place sports bets: "Any person who shall lose or win any money . . . by betting upon any game, election, race, fight, sport, or pastime . . .

---

[1] As explained more below, the State preserves its objection, expressed in its pending remand motion, that the Court lacks subject matter jurisdiction over this removed state court action.

shall be punished by fine." Wis. Stat. ch. 185, § 4535 (1898). Nor could people facilitate sports betting: "[It] shall be unlawful for any person, company or corporation to engage in . . . book-making, . . . or to record or register bets or wagers . . . upon the result of any trial or contest of skill, speed or power of endurance of man or beast, . . . and it shall also be unlawful for any person to become the custodian or depository for gain . . . of any money . . . staked . . . upon any such result . . . ." Wis. Stat. ch. 185, § 4539b (1898).

Later, in 1929, the Wisconsin Legislature "declared" sports betting to be "gambling and to be unlawful and to constitute a public nuisance." Wis. Stat. § 348.085(1) (1929). That declaration covered schemes whereby "any person [was] . . . induced to believe that upon his paying to, or depositing with, any other person, any money, . . . he may as the result in whole or part of any contest of skill, speed or power of endurance of man or beast receive . . . any money." *Id.* Correspondingly, a place where sports betting occurred was "declared to be . . . common gambling house and to be a public nuisance," and it was "made the duty of the attorney-general to take proper action to abate the same." Wis. Stat. § 348.085(2) (1929).

Today, Wisconsin bans most sports betting through two relevant criminal prohibitions of "commercial gambling" in Wis. Stat. § 945.03(1m):

> Whoever intentionally does any of the following is engaged in commercial gambling and, except as provided in sub. (2m), is guilty of a Class I felony:

7

. . . .

(b) For gain, receives, records or forwards a bet or offer to bet or, with intent to receive, record or forward a bet or offer to bet, possesses facilities to do so;

. . . .

(g) For gain, uses a wire communication facility[2] for the transmission or receipt of information assisting in the placing of a bet or offer to bet on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of a bet or offer to bet.

A "bet" is defined as "a bargain in which the parties agree that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value specified in the agreement." Wis. Stat. § 945.01(1). These general prohibitions of "bets" cover sports betting too. *See, e.g., State v. Vlahos*, 50 Wis. 2d 609, 612, 184 N.W.2d 817 (1971) (affirming commercial gambling conviction where "bets" involved money wagered on the outcomes of football and baseball games). A recent law created certain exceptions for tribal-operated sports betting, but that exception does not

---

[2] A "[w]ire communication facility" is defined as "any and all instrumentalities, personnel and services, and among other things the receipt, forwarding or delivery of communications used or useful in the transmission of writings, signs, pictures and sounds of all kinds by means of wire, cable, microwave or other like connection between the points of origin and reception of such transmission." Wis. Stat. § 945.01(6).

extend to non-tribal operators. *See generally* 2025 Wis. Act 247 (creating Wis. Stat. § 945.01(1)(h)).

## II.    Kalshi facilitates sports betting through its event contract trading platform.

### A.    Kalshi makes money by operating a prediction market on which event contracts are traded.

Prediction markets are financial platforms where users can trade event contracts that pay out money based on the outcome of real-world events, such as elections, sporting events, or macroeconomic releases. (Proposed Findings of Fact ("PFOF"), ¶ 1; Kennedy Decl. Ex. 3:2.) Kalshi has explained the concept: "Prediction markets compile the collective opinions of participants to set probabilities and pricing for the contract. Each trader's bet helps shape the market consensus, which is reflected in the contract prices. Contract prices fluctuate in real time, offering up-to-date insights into public opinions and emerging trends." (PFOF ¶ 2; Kennedy Decl. Ex. 3:2.) In short, traders buy and sell event contracts for a price X that pay off $1 if a specified outcome occurs and nothing otherwise, but that can be sold earlier at agreed-upon prices. (PFOF ¶ 3; Kennedy Decl. Ex. 3:3.)

Kalshi provides a hypothetical that explains how the dynamic pricing of these event contracts work: "If a contract to predict whether a movie titled XYZ will win Best Picture is trading at $0.60, this price suggests that the majority believe there is a 60% chance that XYZ will win the Oscar. However, if

developments occur that could increase the film's chances of winning, such as a higher number of award nominations, people will start paying more for the 'yes' contracts, changing the price and the odds." (PFOF ¶ 4; Kennedy Decl. Ex. 3:3.)

Kalshi operates a prediction market of this kind, "a platform that allows traders to buy and sell contracts on the outcomes of real-world events." (PFOF ¶ 5; Kennedy Decl. Ex. 4:2.) It offers "an extensive catalog of tradeable events spanning multiple categories," including "economics and finance," "political markets," "[s]ports markets," and "[c]ultural events." (PFOF ¶ 6; Kennedy Decl. Ex. 4:3.) To fund trades on Kalshi's prediction market, users deposit money into accounts controlled by Kalshi. (PFOF ¶ 7; *See generally* Kennedy Decl. Ex. 5.) Kalshi explains that it "facilitates these transactions and generates revenue through small transaction fees on each trade." (PFOF ¶ 8; Kennedy Decl. Ex. 4:2, 6.)

### B.    Kalshi facilitates sports betting through the trading of sports-related event contracts on its prediction market.

Kalshi "offer[s] contracts on game outcomes across football, basketball, baseball, golf, MMA, tennis, and more" and states that "[s]ports markets have become one of [its] fastest-growing segments." (PFOF ¶ 9; Kennedy Decl. Ex. 4:3.) Kalshi further explains that it "earn[s] revenue through explicit

transaction fees" associated with these sports markets. (PFOF ¶ 10; Kennedy Decl. Ex. 4:4.)

One example of a sports-related event contract that Kalshi recently offered involved the 2026 NCAA college basketball tournament. As Kalshi explained, "[w]hen [users] see Kalshi odds or prices listed for the men's basketball tournament, what [they're] really looking at is the implied probability that a team will win the tournament. A team listed at 14 cents to be the men's college basketball champion has roughly a 14% chance of winning the tournament. The higher the price, the higher the market's confidence; the lower the number, the lower the likelihood that traders expect the team will win it all." (PFOF ¶ 11; Kennedy Decl. Ex. 7:2.)

Kalshi allowed users to purchase event contracts corresponding to the likelihood that various teams would win the NCAA tournament championship. As of April 3, 2026, Kalshi showed the race for champion between the University of Michigan, the University of Arizona, and the University of Illinois (PFOF ¶ 12; Kennedy Decl. ¶ 3):



Because Michigan ultimately won, traders who bought contracts taking that position and held them until Michigan won received monetary payouts; traders who took other positions and held them received nothing. (PFOF ¶ 13; Kennedy Decl. Ex. 3:3.)

Myriad other sports-related event contracts are listed for sale on Kalshi's website, including everything from professional basketball games to cricket matches. (PFOF ¶ 14; Kennedy Decl. Ex. 8.) Kalshi's sports-related event contracts mimic traditional forms of sports bets, all of which are available to customers in Wisconsin (PFOF ¶ 15; Kennedy Decl. ¶¶ 2, 4–7):

- Moneyline contracts, which ask which team will win a particular game. An example, as of April 3, 2026:



- Point spread event contracts, which ask whether a team will win (or lose) a game by a given number of points. An example, as of April 3, 2026:



- Over/under contracts, which ask whether the teams competing in game will score over or under a specific number of points. An example, as of April 3, 2026:



- Proposition contracts, which ask whether specific things will occur within a game, like whether a team will reach a certain number of points first. An example, as of April 3, 2026:



At one point, Kalshi advertised its sports-related event contracts as "bets." For instance, the following two images once appeared on Kalshi's official Instagram account:




*See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2024), perma.cc/DT9Y-6C7B. (PFOF ¶ 16.) On multiple other occasions, Kalshi and its representatives (including its CEO) have described Kalshi's event contract offerings as "bets." *See id.;* (PFOF ¶ 17).

Even today, Kalshi calls its event contracts "bets" that involve "wagers." Kalshi explains that "[i]nvestors select markets that align with their interests or expertise and *place bets* using simple 'yes' or 'no' contracts." And Kalshi goes on to say, "*[e]ach trader's bet* helps shape the market consensus, which is reflected in the contract prices." Similarly, Kalshi says that "[t]raders choose

their favorite market, then select their side (yes or no), *the price they are willing to wager*, and the number of contracts they want to buy." (PFOF ¶ 18; Kennedy Decl. Ex. 3:2–3 (emphases added).)

### III.    Robinhood and Coinbase facilitate sports betting through partnerships with Kalshi.

#### A.    Robinhood and Coinbase partner with Kalshi to use Kalshi's prediction market.

Robinhood and Coinbase are two other companies that have partnered with Kalshi to facilitate event contract trading using Kalshi's prediction market facilities.

Robinhood has its own interface for trading event contracts, and it has entered into agreements with Kalshi that allows it to use Kalshi's contract market facilities for this purpose. This means that while Robinhood customers are placing orders for event contract trades in their Robinhood accounts, the trades themselves are taking place on Kalshi's exchange. This is no different from when a Kalshi customer places an order for an event contract trade through her Kalshi account, which is then executed on Kalshi's exchange. The user interface is Robinhood's instead of Kalshi's, which is convenient for Robinhood customers but does not affect the way in which trades are executed on the exchanges. (PFOF ¶ 19; Kennedy Decl. Ex. 9:6–7.)

Similarly, Coinbase offers its customers the ability to trade event contracts on Coinbase's platform through a partnership with Kalshi. This

partnership gives Coinbase's customers access to the array of contracts listed on Kalshi's exchange while using Coinbase's interface. Coinbase customers place orders for event-contract trades through their Coinbase accounts, and the trades are executed on Kalshi's exchange. (PFOF ¶ 20; Kennedy Ex. 10:22–23.)

Both Robinhood and Coinbase, like Kalshi, charge per-transaction fees on the event contract trades that they facilitate. (Kennedy Decl. Ex. 11:11–12; 12:2.) And to fund trades of Robinhood and Coinbase's event contracts, users deposit money into accounts controlled by Robinhood and Coinbase, respectively. (PFOF ¶ 21; *see generally* Kennedy Decl. Ex. 13–14.)

### B. Robinhood and Coinbase facilitate sports betting through the trading of sports-related event contracts.

Like Kalshi, Robinhood offers event contracts that mimic many traditional forms of sports bets. (PFOF ¶ 23; Kennedy Decl. Ex. 15.) Robinhood also offers moneyline contracts, point spread contracts, and over/under contracts. (PFOF ¶ 24; Kennedy Decl. ¶¶ 8–10.) And, also just like Kalshi, Coinbase offers event contracts that do the same. (Kennedy Decl. Ex. 16.) Coinbase too offers moneyline contracts, point spread event contracts, over/under contracts, and proposition contracts. (PFOF ¶ 25; Kennedy Decl. ¶¶ 11–14.) Both Robinhood and Coinbase's sports bets are available to customers in Wisconsin. (PFOF ¶ 26; Kennedy Decl. ¶ 2.)

**IV. The State brings this motion for preliminary injunction while preserving its objection to the Court having subject matter jurisdiction over the action.**

The State of Wisconsin commenced this action in the Dane County Circuit Court; Defendants filed a notice of removal. (Dkt. 1.) The State has moved to remand the action to state court pursuant to 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction. (Dkt. 27.) That motion is pending. The State is filing this motion for preliminary injunction while preserving its objection—expressed in its remand motion—that the Court lacks jurisdiction. The State seeks a ruling on this motion only if the Court denies the State's motion to remand.[3]

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must show that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interests." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). There must be a "strong showing" that the movant is likely to succeed on the merits. *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 614 (7th Cir. 2024). The two most important factors

---

[3] The State is filing this preliminary injunction motion now so that, if the Court denies the State's remand motion, this motion is already fully briefed and ready for the Court to resolve (as opposed to the extra delay that would follow from waiting to refile the motion after a remand decision).

are the likelihood of success on the merits and irreparable harm. *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024).

## ARGUMENT

**I.    The State has made a "strong showing" that Defendants are causing a public nuisance by facilitating illegal sports betting.**

There is little doubt that Defendants' sports betting operations cause a public nuisance by repeatedly violating the criminal gambling prohibitions in Wis. Stat. § 945.03(1m).[4] Moreover, Defendants' primary defense against similar charges in other States will likely fail: federal law does not preempt every single sports betting regulation in every single State.

**A.    Defendants' facilitation of sports betting violates Wis. Stat. § 945.03(1m) and thus is causing a public nuisance.**

"[R]epeated violation[s] of . . . criminal statute[s] constitute[ ] per se a public nuisance," *State v. H. Samuels Co.*, 60 Wis. 2d 631, 636, 211 N.W.2d 417 (1973), particularly when they involve gambling activity. *See, e.g., State ex rel. Cowie v. La Crosse Theaters Co.*, 232 Wis. 153, 160–61, 286 N.W. 707 (1939) (holding that criminal violations of lottery prohibition were abatable public nuisances); *State ex rel. Regez v. Blumer*, 236 Wis. 129, 130, 294 N.W. 491

---

[4] Wisconsin substantive law applies to this state law claim. *See Sumrall v. LeSea, Inc.*, 104 F.4th 622, 629 (7th Cir. 2024) (under *Erie*, "federal courts applying state law . . . use state substantive law," including in "state law claims [arising] through supplemental jurisdiction") (alteration in original) (citation omitted).

(1940) (same); *State ex rel. Trampe v. Multerer*, 234 Wis. 50, 53, 289 N.W. 600 (1940) (same, regarding bingo game).

Here, Kalshi, Robinhood, and Coinbase are engaging in a public nuisance by repeatedly violating several commercial gambling prohibitions in Wis. Stat. § 945.03(1m). Those prohibitions generally cover the making of "bets," which includes the sports-related event contracts traded using Defendants' services. Again, a "bet" is "a bargain in which the parties agree that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value specified in the agreement." Wis. Stat. § 945.01(1).

Wagers on sports contests are "bets." *See, e.g.*, *Vlahos*, 50 Wis. 2d at 612 (illegal bets involved "outcome" of Green Bay Packers and World Series games). Repackaging ordinary sports bets as "event contracts," as Defendants do, changes nothing. The parties to these contracts still agree to terms that are "dependent upon chance even though accompanied by some skill" (Wis. Stat. § 945.01(1))—that is, the contracts depend on the outcomes of sports contests, the performance of players therein, and the like. And the parties to these contracts still "stand[ ] to win or lose something of value specified in the agreement" (*id.*)—that is, parties who take the correct side of the event contracts will receive money. Taken together, that is a bet.

And Kalshi, Robinhood, and Coinbase each have the requisite connection to these sports bets under Wis. Stat. § 945.03(1m)(b) and (g).

20

First, each one "for gain, receives, records or forwards a bet" under Wis. Stat. § 945.03(1m)(b). Because every sport-related event contract traded on Defendants' markets is a "bet," and because these markets' entire purpose is to facilitate event contract trading, Defendants are "receiv[ing], record[ing] or forward[ing]" bets. And Defendants do so "for gain," given how they collect per-transaction fees on each bet. *Cf. State v. Morrissy*, 25 Wis. 2d 638, 641, 131 N.W.2d 366 (1964) (affirming gambling conviction where operator of poker room collected entry fee from each player).

Second, each one "[f]or gain, uses a wire communication facility for the transmission or receipt of information assisting in the placing of a bet or offer to bet on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of a bet or offer to bet" under Wis. Stat. § 945.03(1m)(g).

Defendants operate "wire communication facilities" under Wis. Stat. § 945.01(6): their online trading platforms are "instrumentalities, personnel and services" that allow for the "receipt, forwarding or delivery of communications" between parties to event contracts through the internet, that is, "by means of wire, cable, microwave or other like connection between the points of origin and reception of such transmission."

And Wisconsin customers use Defendants' "wire communication facilities" both to "transmi[t] [and] recei[ve]" sports-related event contracts,

21

that is, "information assisting in the placing of a bet or offer to bet on any sporting event or contest," and to "transmi[t] . . . wire communication[s] which entitle[ ] the recipient[s] to receive money or credit as a result of a bet or offer to bet," again through Defendants' sports-related event contracts. Wis. Stat. § 945.03(1m)(g). Once more, the transaction fees mean Defendants do all of this "for gain."

These criminal violations of Wis. Stat. § 945.03(1m) are "open[ ], public[ ], repeated[ ], continuous[ ], persistent[ ] and intentional[ ]," *State ex rel. Cowie*, 232 Wis. at 162, and so they "constitute[ ] per se a public nuisance." *H. Samuels Co.*, 60 Wis. 2d at 636.

### B. Federal law does not preempt Wisconsin's gambling ban as applied to Defendants' sports betting operations.

In similar litigation against other States, Defendants haven't argued that their sports betting operations comply with state gambling laws. Rather, Defendants have tried to dodge state gambling law with a preemption argument: they say that federal law—specifically, the Commodities Exchange Act (CEA)—preempts state laws that regulate or ban sports betting.

That preemption theory hinges on how the CEA grants the Commodity Futures Trading Commission (CFTC) "exclusive jurisdiction" over various financial instruments that must be traded on CFTC-approved exchanges. *See* 7 U.S.C. § 2(a)(1)(A). To prevent a repeat of the 2008 financial crisis, the Dodd-

22

Frank Act added a new instrument to the CEA's list: "swaps," an exotic product that had contributed to the 2008 meltdown.[5] In Defendants' view, sports bets are "swaps," and so the CFTC's "exclusive jurisdiction" over "swaps" preempts all 50 states' sports betting laws.

Defendants are wrong on both counts. The CEA doesn't preempt Wisconsin's gambling law as applied to sports bets, which aren't "swaps" anyway.

### 1.    Two clear-statement rules favor the State's position.

Before considering either the CEA's preemptive effect or whether sports bets are "swaps," it is worth addressing two clear-statement rules that favor the State's position on both issues.

The first is a federalism-based presumption against preemption. In every preemption case, courts "start[ ] with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). That presumption becomes even stronger when "Congress has 'legislated . . . in a field which the States have traditionally occupied.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted). Such cases

---

[5] Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* at xxiv (2011), perma.cc/C54L-RZVE; *see also Sec. Indus. & Fin. Markets Ass'n v. United States Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 385–88 (D.D.C. 2014) (explaining role of swaps in financial crisis and Dodd-Frank's background).

must respect "the historic police powers of the States" by finding preemption only where "the clear and manifest purpose of Congress" was to supersede state law. *Id.* In other words, overcoming this strong presumption requires "unmistakably clear" statutory language demonstrating a preemptive effect. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citation omitted).

This case involves gambling regulations, a traditional area of state concern. The Supreme Court has long recognized that "[t]he suppression of gambling is . . . within the police powers of a state," *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). And it recently reaffirmed that sports betting in particular "requires an important policy choice" that "each State is free to [make] on its own." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486 (2018); *see also Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (noting that "the regulation of gambling lies at the heart of the state's police power") (quoting *Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003)). So, federal law historically has "defer[red] to, and even promote[d], differing gambling policies in different States." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999); *see also KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 233–37 (3d Cir. 2026) (Roth, J., dissenting) (explaining why the proper field to consider for this presumption is gambling, not derivatives).

24

Second, the major-questions doctrine bolsters this federalism-based presumption. That parallel doctrine rests on the common-sense observation that Congress doesn't "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In other words, "[e]xtraordinary grants of regulatory authority" in areas of great "economic and political significance" are "rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721, 722–23 (2022) (citation omitted). Such sweeping authority requires "clear congressional authorization," not merely a "colorable textual basis." *Id.* at 722, 724.

Regulation of sports betting is a quintessential "major question." It is of great economic significance, as it involves "billions of dollars" and affects "millions of people." *King v. Burwell*, 576 U.S. 473, 485 (2015).[6] And it is of great political significance: "Americans have never been of one mind about gambling," and the back-and-forth trend of state regulation illustrates the salience of this "important policy choice." *Murphy*, 584 U.S. at 458, 486.

---

[6] Last year, more than 20% of Americans bet money on sports. John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT. And they wagered almost $150 billion on sports in 2024. Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025), https://tinyurl.com/yje8srnp. Just one prediction market that Wisconsin has sued—Kalshi—reports wagering volumes of over $1 billion a month, 90% of which comes from sports betting. Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), perma.cc/X5WL-8LGM.

Transferring every ounce of authority over sports betting from the States to the CFTC—the necessary implication of Defendants' sweeping preemption position—plainly implicates a major question.

These two clear-statement rules mean Defendants face an uphill battle. Not only must they identify "unmistakably clear" language that the CEA preempts state gambling law, they also must locate such language showing that these sports-related event contracts are "swaps" in the first place. *Gregory*, 501 U.S. at 460. Defendants can't accomplish either task.

### 2. Even if sports-related event contracts are "swaps," the CEA does not preempt Wisconsin's gambling laws.

This Court need not address whether sports-related event contracts are "swaps." For even if they are, the CEA still wouldn't preempt Wisconsin's gambling law as applied to sports betting. *See KalshiEX, LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026) (resolving issue without addressing "swaps").

Indeed, the Supreme Court in *Murphy* already indicated why Defendants are wrong. (Doc. 6:23–30.) The "coherent federal policy" in this area "respect[s] the policy choices of the people of each State on the controversial issue of gambling," including a State's decision to "outlaw[ ] sports gambling" altogether. *Murphy*, 584 U.S. at 484. Pairing *Murphy* with the two applicable clear-statement rules addressed above yields an

26

unsurprising result: Wisconsin may ban sports betting at issue here, even when facilitated by prediction markets.

### a. The CEA's reference to "exclusive jurisdiction" is not an express preemption provision.

Express preemption occurs when a statute "explicitly [says] what states may and may not do." *Nationwide Freight Sys., Inc. v. Ill. Com. Comm'n*, 784 F.3d 367, 373 (7th Cir. 2015). The CEA does not "explicitly" prohibit states from regulating sports-related event contracts, and so there is no express preemption here. *Id.*

Defendants point to the CFTC's "exclusive jurisdiction" over "transactions involving swaps" that are "traded . . . on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A); (Doc. 6:25–26). But that would be an "unusual express-preemption provision," as the Sixth Circuit observed. *Schuler*, 2026 WL 1295806, at *4. Such provisions usually "use[ ] words like 'preempt' or 'supersede'" when describing the preempted state laws. *Id.*; *see, e.g.*, 29 U.S.C. § 1144(a) ("supersede"); 46 U.S.C. § 31307 ("supersede[ ]"); 49 U.S.C. § 5125(a) ("preempt[ ]"). Indeed, unrelated CEA provisions explicitly preempt state law in other situations using such language. *See* 7 U.S.C. §§ 16(e)(2) ("supersede and preempt"), 16(h) ("may not be regulated . . . under the law of any State"), 27f(b) ("supersede and preempt"). "Basic interpretive principles" thus indicate

27

that this is not an express preemption provision. *Schuler*, 2026 WL 1295806, at *4.

What, then, does the CEA's exclusive-jurisdiction provision do? The Supreme Court has given the answer: "The purpose of the exclusive-jurisdiction provision" is "to separate the functions of the [CFTC] from those of the Securities and Exchange Commission and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982); *see also Schuler*, 2026 WL 1295806, at *4 (this language "identifies the governing *agency* (the CFTC rather than the SEC or a state regulator), not the governing *law* (whether federal or state)"). Allocating authority among federal regulatory agencies is not the same as "explicitly [saying] what states may and may not do," *Nationwide Freight*, 784 F.3d at 373, and so the CEA does not expressly preempt state gambling law.[7]

### b.    The CEA does not preempt the entire field of sports betting regulation.

Field preemption, in turn, applies "rare[ly]," only where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020)

---

[7] Even when the term "exclusive jurisdiction" doesn't divide authority among federal agencies, courts still don't read it as express preemption language. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 639–40, 643 (2022) (rejecting preemption when the statute included an "exclusive jurisdiction" clause); *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479–82 (1981) (similar).

(citation omitted). Nothing in the CEA "clear[ly] and manifest[ly]," *Medtronic*, 518 U.S. at 485, preempts the field of sports betting regulation, largely because the CEA and other federal statutes "teem with references to state involvement" in this area. *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1129 (6th Cir. 2025).

First, "many" provisions in the CEA "permit[ ] state regulation" of gaming, which strongly cuts against field preemption. *Schuler*, 2026 WL 1295806, at *5; *see also KalshiEX, LLC v. Martin*, 793 F. Supp. 3d 667, 680–82 (D. Md. 2025) (rejecting field preemption partly based on other CEA provisions); *Flaherty*, 172 F.4th at 237–38 (Roth, J., dissenting) (same).

The most powerful evidence is another CEA provision that "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming," but only in specific, unrelated circumstances. *See* 7 U.S.C. § 16(e)(2). The only possible inference is that state gaming regulation (including over sports betting) may continue elsewhere. Another provision contemplates the CFTC disallowing event contracts that are "unlawful under . . . State law," which would make little sense if the CEA also preempted States from deeming those contracts "unlawful" in the first place. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). And even the savings clause within the CFTC's express-jurisdiction provision doesn't "supersede or limit the jurisdiction at any time . . . of any State," 7 U.S.C. § 2(a)(1)(A), which is the opposite of an

29

indication that Congress intended to "[leave] no room for supplementary state legislation." *Kansas*, 589 U.S. at 208. Other similar savings clauses in the CEA further illustrate the lack of field preemption. *See Schuler*, 2026 WL 1295806, at *5 (citing 7 U.S.C. §§ 13a-2(7), 16(e)(1)).

Second, multiple other federal statutes assume that the field of sports betting remains open to state regulation. *See Martin*, 793 F. Supp. 3d at 683 (rejecting field preemption also based on these other federal laws). They also must mean the CEA doesn't preempt this entire field.

For one, the Wire Act, 18 U.S.C. § 1081, *et seq.*, criminally prohibits the interstate transmission of "bets or wagers on any sporting event or contest," unless the bets are "legal" in both States. 18 U.S.C. § 1084(a)–(b). Likewise, the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701, *et seq.*, allows tribes to conduct certain gaming operations on their reservations, but only if the State "permits such gaming." 25 U.S.C. § 2710(b)(1)(A), (d)(1)(B). Both statutes must mean the States have a choice: ban sports betting or not. And the statute addressed in *Murphy*—the Professional and Amateur Sports Protection Act (PAPSA), 28 U.S.C. § 3701, *et seq.*—points in the same direction. When Dodd-Frank added "swaps" to the CEA in 2010, PAPSA generally made it "unlawful for a State to 'authorize' sports gambling schemes." *Murphy*, 584 U.S. at 458. Invalidating PAPSA, *Murphy* thought, left "each State . . . free to act on its own," whether by legalizing sports betting or "outlaw[ing]" it

altogether. *Id.* at 484, 486. But the CEA would leave the States no such choice under any of these other federal statutes, if Defendants are right.

Third, the CFTC recently recognized that it lacks the "statutory mandate" or "specialized experience" to regulate the "rapidly evolving field" of gambling. 89 Fed. Reg. 48968, 48982–83 (June 10, 2024). Instead, the CFTC emphasized, "gambling is overseen by state regulators with particular expertise," and federal derivatives law is not "aimed at protecting against gambling-specific risks and concerns." *Id.*

Because the agency has "no comparative expertise" in the area, "'Congress presumably would not' [have] task[ed] it with" regulating the entire sports betting field. *W. Virginia*, 597 U.S. at 729 (citation omitted). Underscoring the point, the CFTC has promulgated no regulatory structure whatsoever specific to sport betting, such as licensing or background checks, allowable bets, or age restrictions, all of which are common in States that regulate sports betting. It is unlikely that, in response to the 2008 financial crisis, Congress meant to transfer all authority over sports betting to an inexperienced regulator and thereafter leave the field with no meaningful regulation whatsoever.

31

### c.    Wisconsin's sports betting ban is not conflict preempted by the CEA.

That leaves conflict preemption, which applies "where 'compliance with both federal and state regulations is a[n] . . . impossibility,' . . . or where the state law at issue 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Martin*, 793 F. Supp. 3d at 684 (citations omitted). Defendants fare no better here.

Prediction market operators face no "impossibility" because Wisconsin law simply sets a higher floor than the CEA as to sports betting. Typically, an "express preemption clause" is needed to "preempt[ ] state law that extends beyond federal law in any respect." *In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, 755 F. Supp. 3d 208, 212 (E.D.N.Y. 2024). Absent that, the general rule is that "[w]here . . . it is possible . . . to comply with both legal requirements, simply by obeying the stricter one, . . . [f]ederal regulation merely sets a 'floor,' over which States are free to impose additional regulations." *Steel Inst. of New York v. City of New York*, 832 F. Supp. 2d 310, 331 (S.D.N.Y. 2011), *aff'd*, 716 F.3d 31 (2d Cir. 2013); *see also Frank Bros. v. Wis. Dep't of Transp.*, 409 F.3d 880, 895 (7th Cir. 2005) ("[W]here a federal statute provides only a floor, such a statute does 'not stand in the way of a stricter standard that the laws of some States provide.'"(citation omitted)).

A classic example of this floor-ceiling dynamic is *Wyeth v. Levine*, 555 U.S. 555 (2009). That case involved drug labeling, which the federal Food and Drug Administration approves pursuant to the Food, Drug, and Cosmetic Act (FDCA). *Id.* at 566–67. The Supreme Court rejected the argument that the FDCA set "both a floor and a ceiling" and therefore held that the federal law did not preempt state laws requiring "stronger warning[s]" than those the FDA had approved. *Id.* at 573–74. To prohibit stricter state standards for drug labeling, the FDCA would have had to contain an "express pre-emption provision," and it did not. *Id.* at 574.

This case tracks *Wyeth*. Like the FDCA, the CEA requires Kalshi and the like to receive federal agency approval to operate their prediction markets. But, like in *Wyeth*, the CEA doesn't expressly prohibit stricter state standards as to sports betting. To the contrary, Congress "indicated its awareness of the operation of state law" in the gaming arena, *id.* at 575 (citation omitted), through the multiple savings clauses and limited express preemption clauses addressed above. The CEA therefore sets only a regulatory floor in this area. If sports-related event contracts are allowed in a given State, then they must comply with the CEA's regulatory requirements (assuming they qualify as "swaps"). But if a State does *not* allow those contracts, then the CEA's requirements are simply irrelevant. By complying with stricter state law, prediction markets necessarily comply with more forgiving federal law.

Defendants have cited the so-called "impartial access" rule in 17 C.F.R. § 38.151(b) as evidence that it would be impossible to comply with both state and federal law. That doesn't work for several reasons. The only on-point CFTC regulation—17 C.F.R. § 40.11(a)(1)—again bans contracts involving "gaming" or "an activity that is unlawful under any State or Federal law." It is therefore implausible to read the impartial-access rule as somehow *requiring* prediction markets to offer sports betting in all 50 states when a more specific CFTC rule says the opposite. Instead, the impartial-access rule is better read as an "anti-discrimination command," not a "limit on a facially neutral requirement" like Wisconsin's sports-betting ban. *Schuler*, 2026 WL 1295806, at *6; *see also Flaherty*, 172 F.4th at 239 ("The impartial access requirement does not mandate that a particular market exist for event contracts.") (Roth, J., dissenting). And prediction markets *could* comply with both federal and Wisconsin law by not offering sports betting nationwide, consistent with what federal law already requires.

Nor does Wisconsin's sports betting ban frustrate the "full purposes and objectives of Congress" in enacting the CEA and Dodd-Frank. *Martin*, 793 F. Supp. 3d at 684 (citation omitted). "Generic uniformity concerns," *Schuler*, 2026 WL 1295806, at *6, don't trump the lack of clear congressional intent to transfer to the CFTC the States' core police power to regulate or even "outlaw[ ] sports gambling." *Murphy*, 584 U.S. at 484. Nor do uniformity concerns make

34

much sense given the parallel federal laws—the Wire Act and 17 C.F.R. § 40.11(a)(1), among others—that also ban this same sports betting.

### 3. Sports-related event contracts are not swaps, anyway.

Defendants' preemption theory also fails for an independent reason: sports bets are not "swaps" under the CEA, 7 U.S.C. § 2(a)(1)(A), and so the exclusive-jurisdiction clause—even if it might have some preemptive effect— never kicks in.

The primary "swap" definition on which Defendants rely is this: any "contract" where "payment" depends on "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii); (Doc. 6:19–21). Sports bets do not fall within this definition, as several federal courts have already concluded. [8]

Begin with four critical pieces of context. First, reading "swaps" broadly enough to include sports bets detaches the term from the CEA's context and would swallow the CEA's other five "swap" definitions. *See* 7 U.S.C. § 1a(47)(A). Those other five definitions "refer almost exclusively to financial measures,

---

[8] *See KalshiEX, LLC v. Schuler*, No. 25-CV-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025); *N. Am. Derivatives Exch., Inc. v. Nev. on Rel. of Nev. Gaming Control Bd.*, No. 25-CV-978-APG, 2025 WL 2916151 (D. Nev. Oct. 14, 2025). *But see KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX, LLC v. Orgel*, No. 26-CV-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026).

indices, or instruments." *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025); *see also KalshiEX, LLC v. Schuler*, No. 25-CV-1165, 2026 WL 657004 at *6 (S.D. Ohio Mar. 9, 2026). That makes sense given Dodd-Frank's context: addressing risky financial products that drove the 2008 financial crisis.

The main definition on which Defendants rely—7 U.S.C. § 1a(47)(A)(ii)—should be interpreted in this light, which means it does not cover sports bets, a form of gambling that has never been viewed as a financial instrument. Moreover, if that one "swap" definition includes virtually any futures contract with a tangential economic effect—which is essentially the CFTC's capacious view—the CEA's other five more specific definitions would be superfluous. Such a reading is disfavored. *See N. Am. Derivatives Exch., Inc. v. Nev. on Rel. of Nev. Gaming Control Bd.*, No. 25-CV-978-APG, 2025 WL 2916151, at *9 (D. Nev. Oct. 14, 2025) ("*Crypto.com*").

Second, the CEA's "swap" definition must be read in the context of other federal gaming statutes. *See United States v. Worthen*, 60 F.4th 1066, 1071 (7th Cir. 2023) (when interpreting federal law, "different acts which address the same subject matter . . . should be read together such that the ambiguities in one may be resolved by reference to the other"). As discussed above, the Wire Act and IGRA both assume that States can ban sports betting, despite the CEA. And PAPSA assumed the same, at least until *Murphy* invalidated its

36

main commandeering provision. Any tension between these statutes can be resolved by rejecting Defendants' broad reading and instead interpreting the CEA's term "swaps" not to include sports bets. That harmony provides another reason to favor the State's view. *See Martin*, 793 F. Supp. 3d at 683.

Third, interpreting "swaps" to cover sports bets is particularly implausible given how "the CEA states that all swaps must be traded on an exchange," with few exceptions. *Hendrick*, 817 F. Supp. 3d at 1030; *see* 7 U.S.C. § 2(e) ("It shall be unlawful . . . to enter into a swap unless the swap is entered into on . . . a board of trade designated as a contract market under [the CEA]"). If, as Defendants argue, sports-related event contracts are "swaps" merely due to their financial consequences, "then all contracts for payment based on the outcome of a sporting event—all sports bets—would be forced onto [prediction markets]." *Schuler*, 2026 WL 657004, at *6. But many States have legalized sports betting through sportsbooks that are not CFTC-registered exchanges. Can it be that no one noticed until now that those sportsbooks all have been violating the CEA since 2010?

Fourth, Defendants' broad reading would again conflict with the presumption against preemption and the major questions doctrine. Compare this case to *Bond v. United States*, 572 U.S. 844, 847 (2014), which involved an "extremely broad[ ]" definition of the term "[c]hemical weapon" that if, read literally, would have covered the criminal conduct at issue. But because doing

37

so would have "alter[ed] sensitive federal-state relationships" and "convert[ed] an astonishing amount of 'traditionally local criminal conduct' into 'a matter for federal enforcement,'" the Supreme Court rejected such a broad reading. *Id.* at 863. Reading "swap" as broadly as Defendants suggest would have the same effect here, further cutting against Defendants' view.

Taken together, this context requires interpreting "swap" to exclude sports bets. Two textual pieces of the "swap" definition support this reading.

One, sports bets do not involve an "event" or "contingency," the first piece of the definition. 7 U.S.C. § 1a(47)(A)(ii). In the sporting context, the relevant "event" or "contingency" is whether the sporting contest will occur, not the winner of that contest, the performance of players therein, and the like. *See Crypto.com*, 2025 WL 2916151, at *8. But sports-related event contracts don't pay out based on whether the sporting event occurs; they pay out based instead on the "outcomes of sporting events or on things that happen during a sporting event"—who wins, how many points are scored, and the like. *Hendrick*, 817 F. Supp. 3d at 1026; *see also Schuler*, 2026 WL 657004, at *5–6. Since such contracts do not involve "events" or "contingencies," they are not "swaps." *Id.*

Two, sports bets are not "associated with a potential financial, economic, or commercial consequence," the second piece of a swap. 7 U.S.C. § 1a(47)(A)(ii). Context gives this phrase meaningful content beyond just anything that might happen someday, again through the other swap definitions that involve

38

"financial measures, indices, or instruments." *Hendrick*, 817 F. Supp. 3d at 1027. To comfortably fit with this context, the event at issue must have an "inherent[ ]" connection to financial measures and instruments, *id.* at 1027–28—that is, the events themselves must have financial consequences, regardless of whether someone engages in separate transactions related to the event. As *Hendrick* put it, something is not a swap simply due to "externalities like potential downstream financial consequences." *Id.* at 1028. Sports bets hinge on sporting contests, not financial measures or instruments like interest rates, commodity prices, or foreign exchange rates, and so they are not "swaps" for that additional reason. *See Schuler*, 2026 WL 657004, at *5–6.

*        *        *

Federal law likely does not preempt Wisconsin's sports betting ban, and there is no real question that Defendants are causing a public nuisance by violating that ban. The State has therefore made the necessary showing that it is likely to succeed on the merits.

## II.    Defendants' criminal sports betting operations are causing irreparable harm to Wisconsinites.

Because Kalshi, Robinhood, and Coinbase are engaging in a public nuisance, the State may obtain an injunction without a separate showing of irreparable harm. But even if the State must make that showing, it can:

39

Defendants' sports betting operations cause irreparable harm because they are criminal violations and they threaten public health.

### A. Defendants' public nuisances can be enjoined without a separate showing of irreparable harm.

When the government enforces a statute that allows for injunctions, it "may obtain an injunction absent a showing of irreparable harm where the law is silent on injury caused." *State v. C. Spielvogel & Sons Excavating, Inc.*, 193 Wis. 2d 464, 479, 535 N.W.2d 28 (Ct. App. 1995).[9] For instance, in *C. Spielvogel*, the State enforced an environmental protection statute which provided that violations were to be "deemed a public nuisance" and allowed for "injunctional" relief. *See* Wis. Stat. § 144.98 (1991–92). Because the statute

---

[9] Many other jurisdictions also recognize that, when a government is enforcing statutes, it usually need not make a separate showing of irreparable harm to obtain an injunction. *See, e.g.*, *City of Miami v. City of Miami Firefighters' & Police Officers' Ret. Tr. & Plan*, 249 So. 3d 709, 714 (Fla. Dist. Ct. App. 2018); *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 121 (2d Cir. 2010); *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992); *Com. v. Mass. CRINC*, 466 N.E.2d 792, 798 (Mass. 1984); *People ex rel. Sherman v. Cryns*, 786 N.E.2d 139, 150 (Ill. 2003); *State ex rel. Off. of Att'y Gen., Bureau of Consumer Prot. v. NOS Commc'ns, Inc.*, 84 P.3d 1052, 1054 (Nev. 2004); *Ackerman v. Tri-City Geriatric & Health Care, Inc.*, 378 N.E.2d 145, 148 (Ohio 1978); *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989); *State ex rel. Ross v. Overcash*, 666 S.E.2d 217 (N.C. Ct. App. 2008); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984); *IT Corp. v. County of Imperial*, 672 P.2d 121, 126 (Cal. 1983); *New Hampshire Dep't of Env't Servs. v. Mottolo*, 917 A.2d 1277, 1283 (N.H. 2007); *Ouachita Par. Police Jury v. Am. Waste & Pollution Control Co.*, 606 So. 2d 1341, 1350 (La. Ct. App. 1992); *Boone Creek Props., LLC v. Lexington-Fayette Urb. Cnty. Bd. of Adjustment*, 442 S.W.3d 36, 40 (Ky. 2014).

"ma[de] no mention of harm," the State could obtain an injunction without showing irreparable harm. *C. Spielvogel*, 193 Wis. 2d at 480.

The public nuisance statute works the same way. Like the statute in *C. Spielvogel*, Wis. Stat. § 823.02 allows for "action[s] to enjoin a public nuisance" without requiring any specific damages showing. That makes sense, because a public nuisance "involves the impingement of public rights, rights that are common to all members of the public." *Bostco LLC v. Milwaukee Metro. Sewerage Dist.*, 2013 WI 78, ¶ 29, 350 Wis. 2d 554, 835 N.W.2d 160. An impingement of public rights is, by definition, "not adequately compensable in damages," *Pure Milk Products Co-op. v. National Farmers Organization*, 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979), which explains why "[i]t is the fact of being a public nuisance that invokes and supports the remedy by abatement." *State ex rel. Cowie*, 232 Wis. at 162.

Because Defendants' sports betting operations are causing a public nuisance, the State can obtain an injunction without any separate showing of irreparable harm.

### B. Defendants' open, repeated, ongoing criminal violations are causing irreparable harm.

Defendants' open, repeated, and ongoing violations of criminal gambling statutes are also causing irreparable harm to the State's sovereign police powers.

41

The supreme court has long recognized how the police power represents the State's "sovereign authority" to "prohibit all things hurtful to the comfort and welfare of society." *Mehlos v. City of Milwaukee*, 156 Wis. 591, 597, 146 N.W. 882 (1914); *State ex rel. Carter v. Harper*, 182 Wis. 148, 196 N.W. 451 (1923). Violations of police power statutes, by their nature, threaten "the public order" and represent "offenses against the State." *Wis. Keeley Inst. Co. v. Milwaukee County*, 95 Wis. 153, 156, 70 N.W. 68 (1897) (citation omitted). The State "certainly has an interest in seeing that the law is not continually violated," *State v. J. C. Penney Co.*, 48 Wis. 2d 125, 153, 179 N.W.2d 641 (1970), and harms to that interest—especially when they involve criminal violations— also are "not adequately compensable in damages." *Pure Milk*, 90 Wis. 2d at 800; *cf. People ex rel. Gallo v. Acuna*, 929 P.2d 596, 607 (Cal. 1997) (noting that, through criminal nuisances, "the public is deprived of an important and valuable right, wherefore the injury is irreparable").

The gambling prohibitions in Wis. Stat. § 945.03(1m) are a classic exercise of the State's police power. They reflect our constitution's "strong declaration of the public policy of this state" against gambling. *State ex rel. Trampe*, 234 Wis. at 53; *see also Panzer v. Doyle*, 2004 WI 52, ¶ 94, 271 Wis. 2d 295, 680 N.W.2d 666, *abrogated by Dairyland Greyhound Park, Inc. v. Doyle*, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408 (explaining that the "strong state policy against gambling" is "enforced in ch. 945's criminal statutes").

42

Unsurprisingly, then, cases enjoining gambling-related criminal violations have never mentioned any additional irreparable harm showing beyond the violation itself. *See State ex rel. Cowie*, 232 Wis. 153; *State ex rel. Regez*, 236 Wis. 129; *State ex rel. Trampe*, 234 Wis. 50.

Defendants' criminal violations of Wis. Stat. § 945.03(1m) therefore cause irreparable harm to the State. By flaunting the "strong state policy against gambling," *Panzer*, 271 Wis. 2d 295, ¶ 94, they injure the State's sovereignty and public order in a way that can "never be retracted." *State v. Dairyland Power Co-op.*, 52 Wis. 2d 45, 54–55, 187 N.W.2d 878 (1971).

## C.   Defendants' sports betting operations cause irreparable public health harms.

Setting aside the public nuisances and criminal violations, courts widely recognize that public health harms qualify as irreparable injuries that justify injunctive relief, *see, e.g.*, *Grisham v. Romero*, 483 P.3d 545, 555 (N.M. 2021), *Colorado v. United States Department of Health & Human Services*, 788 F. Supp. 3d 277, 311 (D.R.I. 2025), including when they involve unlawful gambling activity, *see, e.g.*, *New York v. Shinnecock Indian Nation*, 280 F. Supp. 2d 1, 5 (E.D.N.Y. 2003); *State v. Epic Tech, LLC*, 378 So. 3d 467, 487 (Ala. 2022).

Unregulated gambling poses serious public health risks by threatening a gambler's financial, economic, emotional, and physical well-being, as well as

the well-being of their families and communities. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders categorizes gambling disorder as an addictive disorder, which includes symptoms such as an increased tolerance for gambling (i.e., more money wagered over time); repeated unsuccessful efforts to control or stop gambling; and concealing gambling involvement. (PFOF ¶ 27; *see generally* Kennedy Decl. Ex. 17–18.) Research even suggests a positive association between problematic gambling behavior and suicidality, driven primarily by indebtedness and shame resulting from gambling. (PFOF ¶ 28; Kennedy Decl. Ex. 21:1.)

And unregulated sports betting presents all these problems. A review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling problems among sports bettors is at least twice as high as among gamblers in general," and "the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems." (PFOF ¶ 29; Kennedy Decl. Ex. 19:1.) According to other research, "not only does sports betting lead to increased betting activity, but it also leads to higher credit card balances, reduced available credit, decreased net investments in financial markets, and greater participation in lottery play.

These effects are particularly pronounced among financially constrained households." (PFOF ¶ 30; Kennedy Decl. Ex. 20:35.)

Of course, thoughtful regulatory systems (like those found in other States) can mitigate these harms. But Defendants treat Wisconsin as if just about anything goes. And there is likely no practical way the State could measure these state-wide public health harms and recover them as damages from Defendants, assuming chapter 823 would even allow that kind of remedy. The State simply has no way to, for instance, determine who has used Defendants' services to gamble away his life savings and thereby lost his ability to provide for the "needs and welfare of himself or family." *City of Milwaukee v. Milwaukee Amusement, Inc.*, 22 Wis. 2d 240, 249, 125 N.W.2d 625 (1964). Once these gambling harms happen, there is no going back; the only remedy is to stop them from happening in the first place. *Cf. State v. CGIP Lake Partners, LLP*, 2013 WI App 122, ¶ 26, 351 Wis. 2d 100, 839 N.W.2d 136 (State could obtain injunction for violation of environmental protection statute without "prov[ing] particular instances of environmental harm").

## III. The balance of equities and public interest strongly favor a preliminary injunction.

The balance of equities and public interest strongly favor entering a preliminary injunction to enjoin Defendants' illegal sports betting operations in Wisconsin. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (when the

45

government is a party, "assessing the harm to the [government] and weighing the public interest . . . merge.") Defendants entered the state's market only recently; their financial interests in this state are not deeply rooted, and they chose to engage in the challenged conduct despite state laws that plainly prohibit it.

On the other side of the ledger, the Sixth Circuit recognized the significance of a state's public interest in regulating gambling within its borders when it recently denied an injunction pending appeal to KalshiEX in the company's lawsuit against Ohio. *Schuler,* 2026 WL 1295806, at *7. The Sixth Circuit emphasized Ohio's strong public interest in "enforc[ing] one of its longstanding police powers: the regulation of gambling" along with "protecting young people from addictive habits." *Id.* Furthermore, the Sixth Circuit found that although Kalshi might suffer financial harms, the district court correctly found that those financial harms were "dwarfed by Ohio's interest in exercising its police power, enforcing its duly-enacted laws, and regulating sports gambling to promote the public welfare." *Id.* (quoting *Schuler*, 2026 WL 657004, at *10).

Wisconsin's interests are comparable and greatly outweigh whatever financial harms Kalshi may experience when preliminarily enjoined.

## CONCLUSION

The Court should issue a preliminary injunction enjoining and restraining Kalshi, Robinhood, and Coinbase, as well as their officers, employees, agents, successors, and anyone acting on their behalf, from making sports-related event contracts available for trading by customers located in Wisconsin.

Dated this 9th day of June 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Colin T. Roth
COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

LEWIS W. BEILIN
Assistant Attorney General
State Bar #1038835

Attorneys for Plaintiff

48

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636 (Roth)
(608) 266-5218 (Gibson)
(608) 266-3076 (Beilin)
(608) 294-2907 (Fax)
colin.roth@wisdoj.gov
charlie.gibson@wisdoj.gov
lewis.beilin@wisdoj.gov